UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| DAVID DWAYNE WHITMAN,<br><br>Plaintiff,<br><br>v.<br><br>JPMORGAN CHASE BANK, N.A.,<br><br>**Serve:**<br>Registered Agent<br>CT Corporation System Inc.<br>28 Liberty Street, 42nd Floor<br>New York, NY 10005<br>Defendant. | **COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1. This action arises out of Defendant's violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA").

**JURISDICTION**

2. Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the conduct at issue occurred in this District, Plaintiff resides in this District, and Defendants conduct business in this District. See *Ford Motor Co. vs. Montana Eighth Judicial District Court,* 2021 WL 1132515 (U.S. March 25, 2021).

1

## PARTIES

4.  Plaintiff, David Dwayne Whitman (hereinafter "Plaintiff"), is a natural person who resides in the County of Saint Louis, State of Missouri, and is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

5.  Defendant JPMorgan Chase Bank, N.A. (hereinafter "Defendant"), is a national bank that conducts business in the State of Missouri. Defendant has a principal place of business located at 270 Park Avenue, New York, NY 10017 and has a registered agent of service of CT Corporation System Inc. located at 28 Liberty Street 42nd Floor, New York, NY 10005. Defendant Chase is a "furnisher" of consumer information pursuant to 15 U.S.C. § 1681s-2(b).

## PURPOSE OF THE FAIR CREDIT REPORTING ACT

6.  Consumer credit plays a major role in the lives of American consumers entering into the American marketplace and the economic system in general. Fair and accurate credit reporting acts as a gatekeeper to credit purchases, employment and income, basic commercial services, insurance coverage, housing rentals, and a broad range of other transactions. Robert J. Hobbs & Stephen Gardner, THE PRACTICE OF CONSUMER LAW 39-40 (2nd ed. 2006).

7.  Congress investigated and determined that the banking system is dependent upon fair and accurate reporting, that inaccurate credit reports directly impair the efficiency of the banking system, and that unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. 15 U.S.C. § 1681(a)(1).

8. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

9. The FCRA was proposed in 1968 as an amendment to the original Truth in Lending Act. Senator Proxmire (D-WI) announced his intention to create legislation addressing the growing frequency of cases in which a consumer "is unjustly denied because of *faults or incomplete information in a credit report*," and entered an initial draft of what would eventually become the FCRA into the Congressional Record. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 114 Cong. Rec. 24904 (Aug. 2, 1968)) (emphasis added).

10. Senator Proxmire listed five types of abuses requiring Congressional response, including biased or one-sided information and incomplete information. Anthony Rodriguez et al., FAIR CREDIT REPORTING 8 (5th ed. 2002) (citing 115 Cong. Rec. 2411 (Jan. 31, 1969)).

11. Congress considered inaccurate and misleading information to be the most serious problem. Anthony Rodriguez et al., FAIR CREDIT REPORTING 10 (5th ed. 2002).

12. The FCRA applies to situations in which information relevant to a consumer's "credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living" is collected. Anthony Rodriguez et al., FAIR CREDIT REPORTING 5 (5th ed. 2002) (citing 15 U.S.C. § 1681a(d)).

13. An inaccurate or misleading credit report can not only significantly and unfairly lower a consumer's credit worthiness but can also prevent consumers from full

3

access to the American marketplace and negatively impact a consumer's living standard and general reputation on the whole if a consumer's character and mode of living is not accurately portrayed. Congress enacted the FCRA to prevent this arbitrary and iniquitous result.

14. Furthermore, in 1996, Congress, in an effort to increase the "accuracy and integrity" of information supplied to credit reporting agencies, added 15 U.S.C. § 1681s-2 to the FCRA by passing the Consumer Credit Reform Act. The provision, "[r]esponsibilities of furnishers of information to consumer reporting agencies," subjected data furnishers, who were not previously covered by the FCRA, to requirements related to accuracy and the handling of consumer disputes. These provisions were originally scheduled to sunset in 2003 but were considered important enough to Congress to be made permanent in the Fair and Accurate Credit Transactions Act of 2003. Federal Trade Commission Staff: 40 Years of Experience with the Fair Credit Reporting Act, pp. 1, 2, 92. Retrieved from the FTC website: http://www.ftc.gov/os/2011/07/110720fcrareport.pdf.

15. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

16. Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data

furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

17. That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

18. Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

19. Metro II codes are used on an industry wide form known within the credit industry as an Automated Credit Dispute Verification ("ACDV") electronic form.

20. The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

21. These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

## FACTUAL ALLEGATIONS

22. On or about November 17, 2020, Plaintiff's AT&T cellular phone number (314-378-2200) was ported-out without authorization to Metro PCS by a scammer or thief.

23. Plaintiff lost all access to all calls, messages, etc. for this phone number.

24. That same day, the scammer/thief fraudulently accessed Plaintiff's JPMorgan Chase-Southwest Rapid Rewards Credit Card account (the "Account") via

PayGenius and incurred two charges on the Account, totaling the sum of $22,446.69, neither of which Plaintiff had any knowledge of or otherwise authorized.

25.     PayGenius is an online payment aggregator based in Cape Town, South Africa.

26.     Plaintiff immediately reported the unauthorized charges to Defendant as being fraudulent via telephone.

27.     On November 20, 2020, Plaintiff sent a letter to Defendant disputing the November 17, 2020, Chase Credit Card charges as fraudulent.

28.     Thereafter, Defendant investigated the unauthorized charges and sent the results back to Plaintiff, concluding the Account charges were not fraudulent and reported the Account balance as accurate.

29.     On January 1, 2021, Plaintiff opened an investigation into the phone porting incident with cellular provider AT&T.

30.     While waiting for the results of the AT&T investigation, Plaintiff sent two more letters to Defendant disputing the fraudulent charges on his Chase Credit Card; Defendant verified Plaintiff's Account charges were not fraudulent and reported the Account balance as accurate to the credit reporting agencies without any indication that Plaintiff was disputing the accuracy or completeness thereof.

31.     On April 9, 2021, Defendant concluded its investigation of the fraudulent charges and determined that the credit card charges were valid.

32.     In May 2021, AT&T concluded its investigation and confirmed Plaintiff's phone was in fact ported-out without authorization to Metro PCS on November 17, 2020.

6

The report also concluded Plaintiff lost access to all calls, messages, etc. for this phone number until it was returned to Plaintiff on November 18, 2020 (the following day).

33. Following AT&T's investigation results, Plaintiff sent another letter to Defendant disputing the reporting of fraudulent charges on his Chase Credit Card Account from November 17, 2020. Plaintiff attached to his dispute letter a copy of the results from AT&T's investigation, which concluded Plaintiff's phone was ported-out and information was illegally taken from the phone.

34. Defendant responded to Plaintiff's letter in July 2021, claiming Plaintiff's Account charges were not fraudulent and continued to report the Account balance as accurate to the credit reporting agencies without any indication that Plaintiff was disputing the accuracy or completeness thereof.

35. On or about April 12, 2022, Plaintiff submitted his first indirect dispute to the national credit reporting agency, Trans Union LLC, (hereinafter "TU"), pursuant to 15 U.S.C. § 1681i, stating, in relevant part, that the accounts identified herein incurred fraudulent charges as a result of the phone port and that Defendant was misreporting that Plaintiff's Account was due and owing and that the account was outstanding with balances.

36. TU transmitted Plaintiff's dispute to Defendant in ACDV forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

37. In response, Defendant erroneously responded and verified to TU that Plaintiff's Account balance was accurate.

38. Defendant failed to conduct a reasonable investigation into Plaintiff's April 12, 2022 dispute, failed to review all relevant information available to it, and failed to

update and/or remove the inaccurate account history; in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to TU that Plaintiff's account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

39. On or about May 4, 2022, Plaintiff submitted his second indirect dispute to the national credit reporting agency, Experian Information Solutions, Inc. ("Experian"), pursuant to 15 U.S.C. § 1681i, stating, in relevant part, that the accounts identified herein incurred fraudulent charges as a result of the phone port and that Defendant was misreporting that Plaintiff's account was due and owing and that the account was outstanding with balance. Plaintiff also included the results from AT&T's investigation—concluding that Plaintiff's phone was ported-out and information was illegally taken from the phone—in the indirect dispute to Experian.

40. Experian transmitted Plaintiff's dispute to Defendant in ACDV forms and copies of the dispute correspondence pursuant to 15 U.S.C. § 1681i(a)(2).

41. In response, Defendant erroneously responded and verified to Experian that Plaintiff's Account balance was accurate.

42. Defendant failed to conduct a reasonable investigation into Plaintiff's May 4, 2022 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history; in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to Experian that Plaintiff's account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

43. In or about May 2024, Plaintiff again disputed Defendant's inaccurate reporting of the Account, this third time with TU, Experian and Equifax Information Services LLC ("Equifax"), by sending certified letters to each outlining the account takeover and providing additional details of the fraud. Plaintiff also included the results from AT&T's investigation—concluding that Plaintiff's phone was ported-out and information was illegally taken from the phone.

44. The credit reporting agencies identified above then communicated Plaintiff's disputes to Defendant, allegedly in accordance with 15 U.S.C. § 1681i(a)(2).

45. In response, Defendant erroneously responded and verified to the credit reporting agencies identified above that Plaintiff's Account status and balance were being reported accurately as open with outstanding balances.

46. Defendant failed to conduct a reasonable investigation into Plaintiff's May 2024 dispute, failed to review all relevant information available to it, and failed to update and/or remove the inaccurate account history; in the alternative, to report the account as "disputed" by changing the Metro II CCC (Compliance Condition Code) to "XB," and, instead, incorrectly verified to the credit reporting agencies that Plaintiff's account was being reported correctly, in violation of 15 U.S.C. § 1681s-2(b).

47. Plaintiff has suffered actual damages in the form of hopelessness, stress, irritation, loss of sleep, anger, frustration, anxiety, embarrassment, and the weakening and diminishment of his credit profile, creditworthiness, debt-to-income ratio, and credit score, as a direct and proximate result of Defendant's violations of the FCRA as described above.

## PLAINTIFF'S DAMAGES

48. As a result of Defendant's inaccurate furnishing/reporting, Plaintiff has suffered reduced credit score and profile, out-of-pocket loss, emotional distress, frustration, embarrassment, and anxiety constituting actual damages pursuant to 15 U.S.C. § 1681o(a)(1) and § 1681n.

49. On December 2023, Plaintiff and his family moved into a house they built and attempted to change the property's loan from a construction loan to a mortgage loan. Prior to the inaccurate reporting, Plaintiff was able to procure a mortgage loan at a 4% interest rate.

50. Based on conversations with mortgage brokers, Plaintiff was told he would not receive any home loans due to his poor credit score. This was crushing to Plaintiff and caused him humiliation and mental anguish.

51. Given this information, Plaintiff was required to ask his wife's family for help. Ultimately, Plaintiff's in-laws paid for the $1,600,000 home in April 2023, and Plaintiff is now making payments to his family for his home at a 6% interest rate.

52. Defendant's conduct caused Plaintiff to lose time in excess of $2500, out of pocket expenses in excess of $5000, loss of sleep, loss of his dignity, depression, despair and overall humiliation before his family and in-laws.

53. Plaintiff is entitled to attorney's fees and costs from Defendant pursuant to 15 U.S.C. § 1681o(a)(2) and § 1681n.

## **RESPONDEAT SUPERIOR LIABILITY**

54. The acts and omissions of employees and other agents of Defendant who communicated with Plaintiff and/or with the CRAs were committed within the time and space limits of their agency relationship with their principal, Defendant.

55. The acts and omissions by these agents were incidental to, or of the same general nature as, the responsibilities these agents were authorized to perform by Defendant.

56. By committing these acts and omissions against Plaintiff, these agents were motivated to benefit their principal, Defendant.

57. Defendant is therefore liable to Plaintiff through the Doctrine of Respondeat Superior for the intentional and negligent acts, errors, and omissions done in violation of federal law by its agents, including but not limited to violations of the FCRA.

## **STANDING**

58. Standing is proper under Article III of the Constitution of the United States of America because Plaintiff's claims state:

   a. a valid injury in fact;

   b. which is traceable to the conduct of Defendant;

   c. and is likely to be redressed by a favorable judicial decision.

*See Spokeo, Inc. v. Robins,* 136 S. Ct. 1540, 1547 (2016), and *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).

59. In order to meet the standard laid out in *Spokeo* and *Lujan*, Plaintiff must clearly allege facts demonstrating all three prongs above.

*The "Injury in Fact" Prong*

60. Plaintiff's injury in fact must be both "concrete" and "particularized" in order to satisfy the requirements of Article III of the Constitution, as laid out in *Spokeo. Id.*

61. For an injury to be "concrete" it must be a *de facto* injury, meaning that it actually exists. In the present case, Defendant's actions negatively impacted Plaintiff's credit.

62. For an injury to be "particularized" means that the injury must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. In the instant case, Plaintiff personally suffered worse credit, less favorable loan terms, and emotional distress.

*The "Traceable to the Conduct of Defendants" Prong*

63. The second prong required to establish standing at the pleadings phase is that Plaintiff must allege facts to show that Plaintiff's injury is traceable to the conduct of Defendant.

64. In the instant case, this prong is met simply by the facts that the violative conduct contemplated in this Complaint was initiated by Defendant directly, or by Defendant's agents at the direction of Defendant.

*The "Injury is Likely to be Redressed by a Favorable Judicial Opinion" Prong*

65. The third prong to establish standing at the pleadings phase requires Plaintiff to allege facts to show that the injury is likely to be redressed by a favorable judicial opinion.

66. In the present case, Plaintiff's Prayers for Relief include a request for statutory and actual damages. The damages were set by Congress and specifically redress the financial damages suffered by Plaintiff.

67. Furthermore, the award of monetary damages redress the injuries of the past, and prevent further injury by Defendant in the future.

68. Because all standing requirements of Article III of the U.S. Constitution have been met, as laid out in *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016), Plaintiff has standing to sue Defendant on the stated claims.

## TRIAL BY JURY

69. Plaintiff is entitled to, and hereby demands, a trial by jury. U.S. Const. amend. VII; Fed. R. Civ. P. 38.

## CAUSES OF ACTION

### COUNT I.

### VIOLATIONS OF THE FAIR CREDIT REPORTING ACT – 15 U.S.C. § 1681 *et seq.* AGAINST DEFENDANT DATA FURNISHER

70. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

71. Defendant violated 15 U.S.C. § 1681s-2(b) by failing to conduct multiple reasonable investigations with respect to the disputed account information, failing to review all relevant information available to it and documentation provided by Plaintiff, and failing to update and/or remove the inaccurate tradeline or, in the alternative, to report the account as "disputed."

13

72. As a result of Defendant's violations of the FCRA, Plaintiff has suffered actual damages, out of pocket loss, not limited to detriment to his credit rating, less favorable loan terms, emotional distress, embarrassment, mental anguish, and anxiety in an amount to be determined at trial.

73. Defendant's conduct, actions, and inactions were willful, rendering them liable for damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

74. Alternatively, Defendant's violations were negligent, rendering it liable for damages under 15 U.S.C. § 1681o.

75. Plaintiff is entitled to recover actual damages, statutory damages, and costs and attorneys' fees from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. §§ 1681n and 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendant for:

- an award of actual and statutory damages, against Defendant for its violations of the FCRA, pursuant to 15 U.S.C §§ 1681n and 1681o;
- an award of punitive damages against Defendant for its willful noncompliance with the FCRA pursuant to 15 U.S.C. § 1681n;
- an award of costs and attorney's fees against Defendant pursuant to 15 U.S.C. §§ 1681n and 1681o; and
- such other and further relief as the Court may deem just and proper.

Dated this 23rd day of December 2024.

Respectfully submitted,

By: */s/ Kaitlin Carpenter*

Kaitlin Carpenter, Esq.
Attorney I.D. #: 74599 (MO)
James G. Onder, Esq.
Attorney I.D. #: 38049 (MO) / 6200444 (IL)
**OnderLaw, LLC**
110 East Lockwood
Saint Louis, MO 63119
Telephone: 314-963-9000
carpenter@onderlaw.com
Onder@onderlaw.com

and

By: */s/ Thomas J. Lyons Jr.*
Thomas J. Lyons, Jr., Esq. (*To be admitted pro hac vice*)
Attorney I.D. #:  0249646 (MN)
Carter B. Lyons, Esq. (*To be admitted pro hac vice*)
Attorney I.D. #: 403655 (MN)
**CONSUMER JUSTICE CENTER P.A.**
367 Commerce Court
Vadnais Heights, MN 55127
Telephone:  651-770-9707
tommy@consumerjusticecenter.com
carter@consumerjusticecenter.com


**ATTORNEYS FOR PLAINTIFF**

15

## VERIFICATION OF COMPLAINT AND CERTIFICATION BY PLAINTIFF

I, David D. Whitman, declare under penalty of perjury, as provided for by the laws of the United States, 28 U.S.C. § 1746, that the following statements are true and correct:

1. I am a Plaintiff in this civil proceeding.
2. I have read the above-entitled civil Complaint prepared by my attorneys and I believe that all of the facts contained in it are true, to the best of my knowledge, information and belief formed after reasonable inquiry.
3. I believe that this civil Complaint is well grounded in fact and warranted by existing law or by a good faith argument for the extension, modification, or reversal of existing law.
4. I believe that this civil Complaint is not interposed for any improper purpose, such as to harass any Defendant(s), cause unnecessary delay to any Defendant(s), or create a needless increase in the cost of litigation to any Defendant(s), named in the Complaint.
5. I have filed this civil Complaint in good faith and solely for the purposes set forth in it.

Dated this 18 day of NOV 2024.

David D. Whitman